<table>
<tr><td>14</td><td>9</td></tr>
<tr><td>43a</td><td>264</td></tr>
<tr><td>14</td><td>9</td></tr>
<tr><td>46a</td><td>544</td></tr>
<tr><td>14</td><td>9</td></tr>
<tr><td>130</td><td>439</td></tr>
</table>

## WHITMORE & PEGRAM vs. COATS.

1. In a contract for the delivery of barley, the quality called for, may be ascertained by mercantile usage of the terms employed; and the parties are presumed to use them according to the meaning attached to them by the mercantile community.

2. In an action for not receiving goods bargained and sold, the measure of damages is the difference between the contract price and the price which goods of a similar quality, bear in the market, at the time the tender was made, and the necessary charges attending the sale to other parties.

3. In making up a bill of exceptions, the court may recall and interrogate a witness as to what he swore on the trial; and, in such case, neither party has a right to examine him.

## APPEAL from St. Louis Court of Common Pleas.

### STATEMENT OF THE CASE.

This was an action upon a contract for the delivery of 3000 bushels of barley by respondent to appellants : the contract was to the following effect, viz :

John L. Coates agrees to deliver at St. Louis, Mo., to George Pegram & Co., 3000 bushels prime barley, within the space of 30 days from October 20th, 1849—they, George Pegram & Co., agreeing to pay for said barley one dollar per bushel. This contract was in writing signed by the parties.

The plaintiff in his petition sets forth the contract and alleges that within the time limited therein, he did tender to the appellant three thousand bushels of prime barley, and that the appellants refused to receive the same, &c.

The appellants in their answer admit the contract as stated in the petition of respondent, and also that they received 96 bushels of barley on account of said contract, within the time

stated, but that the same was not prime barley. They further stated that respondent did not tender or offer to deliver to them prime barley sufficient to make up the said quantity of 3000 bushels, but that the respondent broke his contract; that the barley offered to appellants on said contract was not prime barley but far inferior, and in no respect a compliance with said contract.

Upon the trial of this cause, Alexander Hallam, on the part of plaintiff, testified that he made the contract of respondent; that two lots, one of 47 and the other of 49 bushels, were tendered to appellants, and received by them without objection. On the 8th of Nov., 216 sacks were tendered to appellants, a portion of which was objected to. Whitmore, one of the appellants said they would take a part of it, and proceeded to mark out about one-half of it as prime, which he said he would take. The whole was then taken back by me and sold to appellants at 75 cents a bushel, that being the highest market price for prime barley.

Thirteen hundred and forty-four sacks were afterwards tendered to them; they objected to it as not being prime barley. This witness further testified that all the lot tendered was prime barley, except some of the lot tendered on the 8th November, which he agreed was not prime barley. Witness also stated that he was a dealer in barley and other grains; that there are distinctions in barley—that barley is classed as choice, prime, good, good fair and inferior; such distinctions are recognised by barley dealers. When the contract was made, choice barley was worth $1 10, prime $1 05—but it had fallen to 75 cents for prime. Mr. Whitmore said he was buying for Busch, the brewer, and would see him about it, did not know that he had a contract with Buch. Mr. Pegram afterwards said to witness that if the price of barley had not fallen, there would have been no difficulty about it. Witness proposed to appellant to leave it out, he choosing one man and they another, and let them tell the difference, and he would deduct that, if any were found. Appellant would not consent to this. The barley refused was sold by witness for genuine barley, and brought the price of prime barley. There were about two bushels in each sack. On the cross examination of this witness, he said there was another lot of 170 sacks tendered to appellants, and that the barley they objected to as not being prime barley, was sold to them at the highest market price that prime barley was then bringing. The appellants got Mr. Goodrich to look at the barley, and he said it was good, sound, merchantable barley. This witness, on direct examination, said that on the 27th and 29th October there was tendered to appellants—

|  |  |  |  | 51 sacks. |
|---|---|---|---|---|
| On 6th and 7th November | | | ... 170 | " |
| " | 8th | " | ... 216 | " |
| " | 19th | " | ...1344 | " |

Making more than ... 3000 bushels.

Mr. Pomeroy said he was a dealer in grain—barley is distinguished as other grains are. The best is *choice*, next is *prime, good, fair*, &c., &c. Prime means good sound merchantable barley—prime barley should be fit to malt.

M. C. Jackson said there were two or three different qualities, but, in reality, only wo distinctions, to-wit: malting and grinding barley Best barley is choice, next is prime—both malting barley. Saw sample of barley in question, it was good sound merchantable barley. On his cross examination this witness said Mr. Whitmore showed me the barley—it was prime barley. Hallam showed me a better sample of same lot.

Mr. Pricton certified as to the distinctions in barley, choice, fine, &c.

Mr. Ganest examined the barley—some was prime and some was not; it was good, but not prime barley; that is, he should not call it prime in that state of the market.

Mr. T. H. Warren sampled the barley in question; it was merchantable, sound and prime; it was not all equally good, but take it together it was prime barley.

On the part of the appellants.

John P. Noys said he bought six hundred sacks of the barley in question for Fulton Brewery. It was second rate barley, not prime. Said he did not buy it as prime barley; prime

barley was worth ten cents more than he paid for this—that is, what the brewers call prime barley—bought for Wainright.

Saml. Wainright bought 1200 bushels of the barley for Fulton Brewery; it was second rate barley, not prime, &c.

Mr. A. Memnon buys for the brewery. Knows the distinctions in barley; saw this barley—it was not prime. Choice barley is better than prime; said he knew what he called a "prime article."

A. N. Jones buys barley for the St. Louis Brewery; saw a sample, from 20 to 30 sacks, of the barley in question. It was fair barley, some of it prime, some neat fair; as a whole, it was neat prime barley. I know the distinction recognized by merchants. It all made good fair barley.

Mr. F. Jacoby, a brewer by trade, saw the barley in question; it was bad barley; took sample from 25 to 30 sacks. It was fair barley, but not prime; it was not white or full grain —oats in it; only saw one pile. On cross examination he said prime barley is "right good white barley, full grain and clear."

G. W. Busch said he knew the distinctions in barley; has been a brewer for 17 years. The barley in question was refused by him because it was not prime. The barley was second rate. Hallam offered it to me at any price. On his cross examination he said he used only the best article, and by prime barley he meant the best article.

Alexander Hallam, recalled by plaintiff, says, the barley sold Noyes was the same tendered to Whitmore. There was some inferior, amounting to 38 sacks, but can't say it was that sold to Wainright. Defendant paid witness 75 cents a bushel for the barley refused on the contract—that was the price of prime barley.

The barley was sold to Pegram & Co., defendants, for Busch, and they paid the highest market price. Witness said he tendered 170 sacks of prime barley, in addition to what was before stated. This is all the evidence given. The plaintiff then asked six instructions, all of which were refused, and the court, on its own motion gave the following :

1. If the jury believe from the evidence that the barley tendered to the defendant was of the quality called for by the contract, they will find for the plaintiff. What quality of barley the contract called for, can be ascertained by mercantile usage of the terms employed, and the parties are presumed to use the terms according to the meaning attached to them by the mercantile community.

2. If the jury believe from the evidence that the defendants received, without objection, a quantity of barley under the contract, it was to that extent a performance of the contract, and if the last barley tendered was of as good quality as that previously received, it is evidence tending to prove that the barley tendered was what the contract called for, and what was meant by the contract.

3. If the jury believe from the evidence that the words "prime barley," in the contract, were used among merchants, not as equivalent to or synonymous with "best," or "choice" barley, but as equilateral to, or synonymous with "good sound merchantable" barley, and if the jury also believe that the barley tendered was "good, sound, merchantable" barley, they will find for the plaintiff.

4. If the jury find for the plaintiff, the measure of damages, is the difference between the contract price and the price which barley of that quality bore in the market at the time the tender was made, and the necessary charges attending the sale to other parties.

5. If the jury believe from the evidence that the barley tendered by the plaintiff to the defendant was not of as good quality as the contract called for, they will find for the defendant.

On motion of appellant's counsel, the following instructions were also given :

If the jury believe from the evidence that the plaintiff, through his request, took back from the defendant a quantity of 216 sacks, more or less, which defendant refused to keep on the contract sued on, it is evidence tending to show the jury the construction which the plaintiff put upon the contract, as well as his judgment of the quality of the barley.

If the jury believe that the barley which the plaintiff took back was part of the 3000

bushels tendered, and that without the quantity so taken back, the 3000 were not tendered, they will find for the defendant.

The jury rendered a verdict for the plaintiff below, and defendants moved to set the same aside for reasons filed. Upon the hearing of said motion, there was a disagreement between the counsel as to what the witness, Hallam, said in regard to the tender of the 170 sacks, under the contract. The defendant denying that Hallam had made any such statement, the plaintiff insisting that he had. The court having no distinct recollection on the subject, recalled Hallam on the hearing of said motion, and enquired of him what his testimony on that point was. The defendants objected to his being recalled. The court also refused to let defendants cross examine H. upon said testimony. H. then stated that he had on his examination on the trial, stated that 170 sacks of prime 'barley were tendered to defendants within the limits of the contract in addition to the other lots.

The motion for new trial being overruled, defendants appeal.

### Hall for appellants.

I. The first and third instructions of the court assume that the meaning of the words "prime barley," in the contract are to be explained by the understanding of a class of men called merchants. There was no proof of a contract with reference to any such meaning. There is a large class of dealers in barley who are not merchants; these are malters and brewers, and it is in proof that the appellants were buying for, and dealing with brewers. Why then, shall the court say that their understanding of the meaning of the terms shall have no weight with the jury, and their judgment upon it be disregarded? Yet such is the law of the court. It completely cuts off from all weight with the jury, the testimony of the appellants' witnesses—this is error.

II. The court tells the jury that if prime barley in mercantile usage, means good merchantable barley, and that was tendered, the contract is satisfied. This cannot be true while the other qualities of barley are also good merchantable barley. The instruction abolishes all distinction which even merchants make in the grain. It declares that if it was good merchantable barley, no matter whether prime or not, which alone they contracted about, it is enough. In the face of the first two, that although prime barley must be good and merchantable and means that, yet, choice and good barley must also be good and merchantable, and mean the same.

III. The court committed an error in recalling the witness, to restore his tesmony. The danger of the practice is a clear condemnation of it. If the court did not know that his testimony sustained the verdict, it should, of course, have granted a new trial.

IV. The court would not allow the opposite counsel to put enquiries to Hallam when recalled and examined. Enquiries, which, if underwent, would make a great difference in the testimony as respected the motion, and as given on the main trial. They would have shown the statements on the motion not to be sustained. A statement is often wholly changed by a few words or a single sentence; by a slight addition or qualification, yet the court would not allow any of this to be shown, but takes down the ex-parte statement of the witness unaffected by cross-examinations or the statements made on the cross-examinations as his evidence in the cause. It is grossly wrong; it is a cause thus denied of the great fundamental right of searching for the truth through the bias or falsehood of a witness. What he says to the court on the motion goes down as his testimony on the trial unquestioned. The court will not permit it to be touched or changed, even by the witness himself. Surely this is manifest error, and the greatness of it is the more apparent, as the judge himself did not pretend to know what the witness did state on the trial, and calls him for the very reason that he does not know.

### Lord, for respondent.

I. The case was fairly submitted to the jury in the court below, upon the law and evidence.

*Whitmore & Pegram vs. Coats.*

*and the court will not disturb the verdict. The instructons given by the court on its own motion, contained a fair exposition of the law of the case, and ought that to be complained of by appellants?*

All mercantile contracts are to be construed according to the usage and custom of merchants. Ch. on Con., p. 82–69; 12 Shep. (25 Maine) p. 401; 5 Meerow & Webley, 540; 3 Barnnall & Adolphus, 728; 7 Carrington & Payne, 701.

The court very properly instructed the jury that the quality of barley called for, could be ascertained by mercantile usage of the terms employed, and that the parties were presumed to use the terms according to the meaning attached to them by the mercantile community. 3 Perry & Davidson, 236; 11 Metcalf, 186.

The second instruction was properly given. The proposition contained in it is chiefly, that if the defendants received without objection, a quantity of barley in fulfillment of so much of the contract of no better quality than the rest tendered, then it was evidence tending to show that the last barley tendered was such as the contract called for. No conclusive evidence, but evidence to be considered by the jury. But the defendants admitted the instruction to be correct; they took all the sting out of it by asking the court to instruct the jury, that if the plaintiffs took back any barley, which defendants refused to keep on the contract, it was evidence tending to show the construction put upon the contract by plaintiffs as well as his judgment of the qualities of the barley.

The third instruction was right. There was proof that prime barley, among merchants, meant good sound merchantable barley.

The plaintiff's witnesses all agreed with one exception, that the barley was prime barley, and was not contradicted by defendants' witnesses. The defendants' witnesses were brewers, or those who purchased for brewers; and they use the word prime, as synonymous with best; they admit the distinction, and called the barley in question, second rate.

Take the instructions all together, and the question was fairly put to the jury: were there, 3000 bushels prime barley tendered to the defendants within the time limited by the contract? The jury found that the contract had been complied with, and this court has repeatedly decided that it will not interfere in such cases, even though they should think that there was contradictory testimony. Robbins vs. Alton, 12 Mo. 381; 6 Mo. 36; 8 Mo. 437; 9 Mo 838; see opinion of McBride on this point, in Clark vs. Toper, 11 Mo. R., 100. The court below approved of the finding. By the testimony of Hallam, uncontradicted, more than enough was tendered to comply with the contract.

The damages were not excessive. There were 100 bushels delivered; there were 400 sold at 75 cts., being $300—less contract price, 25 cts. per bushel, $100 00

|  |  |
|---|---|
| 2,500 bushels, say 85 cts. per bush | 375 00 |
| 2,000 insured upon it, ¼ per ct | 10 00 |
| Drayage | 22 50 |
| Storage | 56 50 |
| Weighing | 15 63 |
|  | $574 63 |

Under the circumstances there was no error in recalling Mr. Hallam. The counsel disagreed about the statement. The court did not recollect, and he was merely recalled and stated what he had sworn to. No harm can arise from the practice. The dispute was about the tender of the 170 sacks, and the witness stated just what the bill of exceptions shows to be the fact. The judge recalled him for his own information, and counsel had no right to examine him.

As to the objection of Mr. Hall, to the ruling of the court below, that the words "prime barley," in used the contract, were to be construed according to the usage and custom of merchants, I say it was not a contract between merchants, who will be presumed to have used the word in its mercantile sense and in no other.

Whitmore & Pegram vs. Coats.

"Mercantile contracts are to be construed according to the usage and custom of merchants, who have a style and language peculiar to themselves, and parol evidence is admissible to show that words apparently having only an ordinary meaning, are known and understood by a certain class of persons to have a special and technical meaning." Gibbs, C. J. & Dallas J. in Gibson vs. Young, 8 Taunton 261, Parke J., in Smith vs. Wilson, 3 B. & Adolphus, 728; 2 Bing. 370; 2 B. & Ad. 106; Ch. on Con. 82.

"The construction of a particular mercantile expression therein, is matter *for the jury*, although it is in general the province of the court to construe a written instrument. Smith vs. Bland, Ry. & Woody, 260; Hutchinson vs. Bouker, 5 Meeron & Welby, 540.

Usage of trade cannot be set up to contravene an established rule of law, but all contracts are presumed to be made in reference to any existing custom relating to such trade; and it is always competent for a party to resort to such usage to ascertain and fix the term of the contract. Ch. on Con., 7 Amer. from 3 Lond, p. 82, and note and cases there cited; 1 Smith's Lead. Cases, 305, *it seq*

A general dictionary of the English language is not admissible to explain mercantile expressions. Houghton vs. Gilbert; 7 Covington & Payne, 701; Ch. on Con. 83. Thus, where timber was sold, warranted "sound," evidence was admitted to show that by the custom of trade the term "sound" means soundness, after making fair and reasonable allowances for unsound parts. Woodhouse vs. Smith, 7 C. & P 310. There is no proof that Coates knew Pegram & Whitmore were buying for the brewers at the time the contract was made. On the contrary, Pegram & Whitmore only informed him that they were buying for Busch when they rejected the barley.

The testimony of Pomeroy, Jackson & Manner sustain the third instruction, and the argument of Mr. Hall seems to be a mere play upon words—"good sound merchantable barley" is called by merchants *prime*. Now, says Mr. H., because there is a higher grade of barley, called choice, which must necessarily be "good, sound, merchantable" barley, the distinction between the grades is destroyed. The proposition is too absurb for comment.

As to the third proposition of Mr. Hall, it is not perceived by me wherein the danger consists in calling upon Mr. Hallam to state what he had sworn to before the jury. Upon the argument of the motion to set aside the verdict of the jury, Mr. H. denies positively a statement made by the witness, and says he does not find it in his minutes. The counsel on the other side finds the statement in his minutes, and insists upon it that the witness had made the statement. The court does not recollect, and calls the witness to state under oath what he had said. The court wished fairly to consider the motion, and there was no more impropriety or danger in recalling the witness at that period of time, than there would have been to have called him to state what he had said upon settling the bill of exceptions. The judge below saw that it would be impossible, in the absence of his recollection to truly settle the bill, whether the witness proved that there were 3000 bushels tendered was fairly before the jury, and they found that the amount of 3000 bushels was tendered.

As to the fourth proposition that the court ought to have allowed the counsel to cross examine the witness, there can be no force in it. The witness was not upon the stand to give evidence in the case. He was called by the judge for his own information; he was not called upon to prove the tender, nor how much was tendered, nor as to any facts in the case, but whether he did not upon the trial state that he tendered 170 sacks of barley. What could be the object of a cross examination? Who was it to influence? How was the truth to be come at by any cross examination? The case was not on trial as to any question of fact, that had already been found.

RYLAND, Judge, delivered the opinion of the court.

From the statement, it will appear that the instructions, which the

court gave for the plaintiffs below, afford the only question, which will demand our consideration.

This was a contract for the delivery of 3000 bushels of "prime barley." The main question before the court and jury below was in relation to the words "prime barley."

There was testimony tending to show the distinctions used among merchants in the quality of barley. There were choice, prime, good, fair and inferior. The proof showed that the first quality was called choice; the next prime, &c. These distinctions were clearly shewed by the testimony of the merchants, who had been in the habit for years of trading in this and other grains. There also was some evidence on the part of brewers, which tended to show that they used the word prime in relation to barley as the first quality.

There was proof conducing to show, that the plaintiff below had within the time limited by his contract, tendered to the defendants the amount or quality contracted for; there was also evidence tending to show the quality of the barley tendered was "prime," and there was also evidence tending to show the quality was not "prime." The testimony for the plaintiff showed, that at the date of the contract, "choice barley" was bringing in the market from $1,05 to $1,10 per bushel. Prime was selling at $1,00. Before the time for delivery under this contract expired, the market had undergone a change, and choice barley was selling at from 90 to 95 cts. per bushel, and prime at 75 cents.

The witness Hallam states that he made the tender for the plaintiff to the defendants, which was rejected—all except some 97 bushels; and that he then sold a part of the barley thus rejected to the defendants at 75 cents, which was the highest price then paid for "prime" barley. He afterwards made other tenders of different quantities, also rejected. He took the rejected barley and sold some to Wainright, and some to Ulrici for 85 cents per bushel. This witness states that, in a conversation with one of the defendants, Mr. Pegram, the defendant said to him, if the price had not fallen, there would have been no difficulty about the matter. The court gave the instructions as set forth above, and the appellants rely upon those given for the plaintiff below as the ground for reversal.

I will not copy the instructions here again—I cannot see any objection to the first instruction given. There is surely nothing improper in referring to the usage of merchants as to the terms employed by them in this contract. The parties were merchants, commission merchants, employed for years as it appears from the evidence in buying and selling grain, barley among other kinds. They were presumed to know other

kinds—they were presumed to know the meaning of the words "prime barley," as well as to know the distinctions of that kind of grain used by those employed in buying and dealing.

The second instruction was not incorrect—the defendant had instructions given to the jury embracing the same principle; if there was any thing wrong intrinsically in the second instruction, the error in this case has been removed by the first instruction given for the defendants below. These two instructions both point the jury to the same principle of ascertaining the meaning of the parties to their contract. In this case then, there has been no injury done to either party by either of these instructions. There is no ground as I can see for objection to the third instruction given above. I find from the bill of exceptions that the witnesses, Pomeroy and Jackson, gave their meaning of the words "prime barley, among merchants," to be, "good sound merchantable barley." This then warranted the instruction given as the third. There is no objection to the other instructions and I pass them by. The only remaining point is the act of the court in calling back the witness Hallam, in order to ascertain from him what was the evidence he had given in relation to the amount of barley tendered under the contract.

Upon the motion for a new trial there was a difference between the counsel as to what was the testimony of the witness Hallam in this particular. The court very properly called Mr. Hallam back and ascertained from him the fact in dispute.

There is nothing wrong in this act of the court, and there was nothing improper in refusing to let the defendant's counsel re-examine Hallam.

The plaintiff was not testifying again to the jury; nor testifying again in the cause. A dispute arose as to what he had stated, and he was merely call to state what had before been said by him.

In making out bills of exceptions, I see no other mode so satisfactory to a judge as that of again calling and learning from the witness the part in dispute about what he had sworn on the trial, so that it might fairly appear in the bill of execeptions. I cannot see any reasonable objection to the course pursued here by the judge, and I cannot see how he could have acted otherwise.

From the whole record in this case, I find the court very properly and very fairly put the matters in issue before the jury; and they having found a verdict in my opinion consonant to the merits and justice of the case, I am disposed to let it stand.

The judgment of the court below is therefore affirmed.