## T. G. ULHORN v. L. COHEN GROCERY CO.

Western Section.  November 18, 1926.

No petition for Certiorari was filed.

1. **Contracts.  Telegrams sent by seller and purchaser held to constitute a binding contract.**

Where a broker representing a grocery company wired to another broker that he had sugar for sale at a given price and the offer was accepted by telegram and the broker for the seller confirmed the sale by telegram, it being shown that though the telegrams were in code, the contents were thoroughly understood by both parties, held the telegrams constituted a binding contract.

2. **Contracts.  Bank guarantee can not be required of purchaser where it was not called for in the original contract.**

Where the original offer of the seller was made subject to the usual trade terms which did not include a bank guarantee by the purchaser, held that the seller could not afterwards require the purchaser to make a bank guarantee, for this would be adding new terms to the contract after it was accepted by the purchaser.

3. **Contracts.  Parole evidence admissible to explain trade terms.**

In an action on a contract for the sale of sugar where the contract consisted of several telegrams which contained code words, held parole evidence was admissible to explain the words which were in common usage in the trade and understood by both parties.

4. **Frauds, Statute of.  Telegrams held a sufficient writing to remove a sale from the statute of frauds.**

Where the contract consisted of telegrams sent by the parties which contained code words, but were fully understood by the agents representing the principals, held that it was evidenced by memorandum in writing and could not be defeated by the statute of frauds.

Appeal from Chancery Court, Shelby County; Hon. Wightman Hughes, Chancellor.

Affirmed.

Fitzhugh, Dixon & Osoinach, of Memphis, for appellant.

Louis B. Shur of St. Louis and S. E. Murray, of Memphis, for appellee.

OWEN, J.  The complainant is a merchandise broker in Memphis, Tennessee.  The defendant is a wholesale grocery corporation doing business in St. Louis, Missouri.  The defendant has appealed from a decree rendered against it wherein complainant sought to recover damages for a breach of contract.  The Chancellor held that a contract had been made between the complainant and defendant wherein the defendant had agreed on February 27, 1923, to sell to complainant 1200 bags of 100 pounds each of granulated sugar, f. o. b New Orleans, at $8.10 per sack or per hundred weight;

that the sugar was not delivered and sugar thereafter advanced to $9.25 per hundred and complainant was entitled to recover $1260 as damages.

That the complainant acted through a broker of Memphis, Tennessee, by the name of M. B. McGee and the defendant acted through a brokerage firm known as the Roth Produce Company of St. Louis, Missouri. The negotiations between the two brokers was carried on by telegrams, telephone conversations and letters.

The defendant has assigned in this court four errors. They raise the following proposition: (1) The court erred in not dismissing complainant's bill and in rendering a decree against the defendant and taxing it with the cost; (2) the court erred in holding that the telegrams constituted a valid and binding contract on the defendant; (3) the court erred in finding that the Roth Produce Company was authorized to bind the defendant in the sale of the sugar in question.

We will treat all of these assignments under one head. The question to be determined is whether or not a valid contract was made between the complainant and the defendant. The defendant denies that Roth had the authority to bind it. It also pleads section 2170 of the Revised Statutes of Missouri to the effect that no contract for the sale of goods for the price of $30 and upwards shall be held to be good, unless the buyer should give something in earnest to bind the bargain, or in part payment, or unless some note or memorandum in writing be made of the bargain. The defendant also relies upon chapter 118 of the Acts of the legislature of Tennessee, 1919, commonly known as the Uniform Sales Law, providing that the contract to sell or sale of any goods or choses in action of the value of $500 and upwards should not be enforceable unless some note or memorandum of contract in writing of the sale be signed by the party to be charged, or his agent.

The material facts and which are not disputed, are: On February 27, 1923, at 5:10 o'clock P. M. Albert M. Roth Company, brokers in St. Louis, Mo., sent the following rush telegram to M. B. McGee, 30 East Caroline Street, Memphis, Tennessee, subject to confirmation: "Subject confirmation two American prompt subject delay eight ten refinery."

The witnesses for both complainant and defendant testified that the telegram was perfectly plain to them, and without any further explanation they knew it meant that some party in St. Louis had placed an order with Roth & Company at St. Louis, to sell two carloads of sugar manufactured by the American Refinery at New Orleans, shipment to be made promptly, subject, however, to any delay which might occur at the refinery, and the price was $8.10 per hundred pounds, or per sack, the sugar being sold in sacks

containing one hundred pounds each, and that a carload of sugar contained six hundred sacks. The telegram further meant that any acceptance of offer was subject to confirmation by the seller.

Upon receipt of the telegram, McGee telephoned T. G. Ulhorn, the complainant, one of his customers, and told him of the offer, and asked him whether he wanted to buy the sugar. Ulhorn authorized him to accept the offer. Whereupon at 6:27 o'clock P. M. on the same day, to-wit, February 27, 1923, McGee wired Roth as follows: "Sold Ulhorn two cars American eight ten basis confirm Quote additional Have other buyers." All the parties testified that the foregoing telegram meant that McGee had sold the two cars of American Refinery Company sugar to T. G. Ulhorn, of Memphis, on the basis of $8.10 per hundred pounds, or per sack, and asked Roth to confirm sale. The telegram sent to Roth by McGee was received by Roth on the morning of February 28th, and at 9:30 A. M. Roth wired McGee as follows: "Confirm Ulhorn contradict (code word meaning 1200 bags) American from Cohen prompt subject refinery delay eight ten. Try secure more Wire later."

The witnesses testified that this telegram also meant, in plain terms so far as their understanding of it was concerned, that Roth, upon receipt of McGee's telegram, had taken the matter up with his customer, L. Cohen Grocery Company, and that the L. Cohen Grocery Company had authorized Roth to confirm the sale of the 1200 bags to T. G. Ulhorn. The three telegrams above quoted, constitute the contracts between the parties.

The witnesses also testified that according to the custom in the trade, they understood without being incorporated in the contract, that the sale was made on such basis of sight draft with bill of lading attached, meaning that Ulhorn had to pay for the sugar before he could get it. In other words, he had to pay the sight draft before he could get the bill of lading, and could not get the sugar without the bill of lading. They also understood that the sugar might come either by rail or by barge; that if it came by barge, the sight draft was payable fifteen days from date of shipment; that if it came by rail the sight draft was payable on arrival of cars containing the sugar. Further, that the sight draft was subject to a discount of two per cent. Later, on the same day, to-wit, February 28th, McGee wired Roth: "Ship Ulhorn rail contradict Cohen," which meant that Ulhorn desired that the 1200 bags be shipped by rail.

This telegram was sent at 5:31 P. M. On the same day, to-wit, February 28th, Albert M. Roth Produce Co. made out its regular sales memorandum covering this transaction, numbered it 4238, sent a copy to McGee and a copy to Cohen Grocery Company. This

original sales memorandum is shown in the record. On the same day McGee made out this memorandum of this transaction, copy of which was sent to Roth Company, and copy to Ulhorn. This original sales memorandum is shown at page 11 of the record. L. Cohen Grocery Company received the sales memorandum from Roth on the morning of March 1st. They testify that upon receipt of same they had an investigation made of Ulhorn's rating; that the result thereof was not satisfactory to them, and as a result they telephoned Roth that they would require a bank guarantee; whereupon Roth sent to McGee the following telegram on March 1st, at 11:10 A. M. "Relative Cohen sale Ulhorn Cohen insists immediate bank guarantee both cars wire quick." This telegram meant that Cohen would not deliver the sugar unless Ulhorn would have some bank in Memphis wire guaranteeing payment of the sight draft. McGee then informed Ulhorn of the contents of the telegram, and Ulhorn advised him that when the contract was made nothing was said about bank guarantee, and he would not furnish one. No answer was made to the telegram, and on March 5th, Roth wrote McGee as follows:

"St. Louis, Missouri, March 5, 1923

M. B. McGee,
Memphis, Tenn.
Dear Sir:

"On March 1st, we wired you as follows:

" 'Relative Cohen sale Ulhorn Cohen insists immediate bank guarantee both cars wire quick.'

"Up to this time we have not received the bank guarantee nor has Cohen. L. Cohen advised us today that these two cars are now in St. Louis and will be on team track tomorrow morning.

"For your information, L. Cohen Gro. Co. have no other sugars unshipped with any of the Louisiana Refineries.

"So there is only one thing that can be done now if Ulhorn can furnish a bank guarantee tomorrow on both cars. Cohen is willing to let them have the two cars at the original cost price provided Ulhorn will take delivery plus the rate of freight to St. Louis, which would fiture 8.65 less 2% St. Louis.

"If Ulhorn desires this agreement made have his bank wire Cohen the guarantee tomorrow and Cohen will make drafts immediately payable at sight.

"As Cohen originally bought these two cars from secondhands they had no control over the shipment from refinery, however, as the sugars have just arrived, they could have made diversion if the Bank guarantee was furnished when originally requested i. e. March 1st the sale was made on Feb. 28th to Ulhorn.

"Our market locally here is weak at this writing, sale of H & E being made as low as 8.40 basis.

"Yours very truly, Alfred M. Roth Co.

E. E. Sappington."

"Be sure wire us immediately upon receipt this letter whether Ulhorn wants the sugar on track here."

In answer to that letter, Ulhorn wired Cohen Grocery Company on March 7th as follows:

"McGee advises twelve hundred bags American you confirm to me on February twenty-eight for Memphis delivery is there stop when you confirmed this lot nothing said about bank guarantee stop I will expect you to ship this lot to Memphis as per your confirmation stop Your draft will be paid as outlined in your confirmation."

In answer to that letter, McGee wrote Roth on March 8th as follows:

"Alfred M. Roth Co.

St. Louis, Mo.

Gentlemen:

"Replying to your letter of the 5th, beg to advise that we did not wire you yesterday, as we took this matter up with Ulhorn, who wired Cohen direct that nothing was said in confirmation of two cars of American about bank guarantee, and that he insisted on shipment being made as per this confirmation. Just what Cohen advised him we do not know, but this is the way it stands as present.

"Very truly yours,

"M. B. McGee."

This constituted all the telegrams and correspondence between the parties relative to the transaction, except the sales memoranda which was sent by Roth to Cohen and McGee, and the sales memoranda which was sent by McGee to Roth and Ulhorn.

It appears that Roth had represented Cohen as a broker prior to the transaction in controversy, and subsequently. It also appears that McGee had bought through Roth quite a large amount of sugar subsequent to the purchase in controversy. Mr. McGee had bought through Roth and from the defendant Cohen Company sugar for the Early-Stratton Company, J. C. Felsenthal and other wholesale concerns and grocers of Memphis.

Mr. Cohen testified that he placed the offer to sell the sugar in controversy with Roth or with the Roth Company over the telephone. It appears that Mr. Sappington, who was a member of the firm of Roth & Company, handled this particular transaction for Cohen. He testified as follows:

"Q. Mr. Sappington, how did you know L. C. Cohen Grocery Company wanted to sell 1200 bags of sugar? A. We are in touch with them all the time, and asked him what he had to offer, and

he told us he had 1200 bags of sugar at New Orleans. Q. How did the conversation take place; over the phone? A. Over the telephone, yes sir. Q. Now, was that customary with you in handling business for the L. Cohen Grocery Company? A. Sometimes we handled it over the 'phone and sometimes we saw them personally. Q. State whether you are in constant touch with that concern, asking for orders and asking for business, either to sell or to place orders with them? A. Yes, sir. Q. State whether or not this particular transaction with L. Cohen Grocery Company was handled as you had been handling that business in the past? A. Well, we telephoned Mr. Cohen that we had sold the 1200 bags for him and he said all right, and so we wired confirming the order to Ulhorn. Q. Did you tell to whom you had sold it? A. I am not quite clear on that at the time. We customarily tell him who it was for and then send him a sales slip. That is how we usually did. Q. Have you in your files a copy of the original telegram sent to Mr. McGee offering this sugar? A. Yes, sir. Q. Now, in non-technical language, what does this telegram mean? A. It means, subject to confirmation, two cars, six hundred bags each 8 1/10 cents per pound, shipment subject to a refinery delay. Q. What does American mean? A. That is American Sugar Refining Company. Q. At the time you sent that telegram, state whether you had authority from the L. Cohen Grocery Company to offer that sugar? A. We had.''

It appears that when Mr. L. Cohen of the Cohen Grocery Company was advised on March 1st that the 1200 sacks of sugar had been sold to complainant, he had complainant's rating looked up in Dunn's Mercantile Agency and he didn't find a rating satisfactory to Cohen. Thereupon he insisted that complainant would have to give a bank guarantee; the sugar was to be shipped with sight draft bill of lading attached. Cohen had not required a bank guarantee when he placed the offer to sell with Roth. Roth had made other sales to Ulhorn; he knew who Ulhorn was and it appears that this transaction was handled in the usual and customary way.

The record discloses that sugar was worth $9.10 at the time this was offered for $8.10. We do not know what it did cost the defendant, or why it was offered at the figure of $8.10 per hundred when the quotation showed sugar at the time to be around $9.10 at New Orleans. Mr. Cohen also testified that the reason why they asked for a bank guarantee they could not tell which way the market would go; that there was no action in the market at the time they asked for bank guarantee.

It is appellant's insistence that: ''Assuming that the Roth Produce Company was authorized to sell the sugar on terms to T. G.

Ulhorn, and without some sort of guarantee, then they insist that the telegrams taken as a whole—that is, treated as one document, do not constitute a valid and binding contract, for the following reasons:

First: "They do not constitute a sufficient note or memorandum under the statute of frauds because they are incomplete in that the entire agreement is not expressed, terms of alleged sale not being incorporated, the parties thereto not being sufficiently named and the quality of the merchandise being omitted."

Second: "A contract to be good and valid must be complete in itself, leaving nothing to rest in parol, and it is submitted that the alleged contract in this case does not contain these essentials."

In support of these two propositions, learned counsel for the appellant submit 'the following propositions of law, sustained by the following authorities:

"A document which, although it contains certain absurdities, leaves no doubt in the mind of either lawyer or layman as to the purchaser, the seller, the subject-matter and the terms, is sufficient to satisfy the statute of frauds." Lenmann v. Jones, 222 U. S., 51.

"Even though all the terms of the sale are stated in writing, yet where one party requests the other party to confirm the transaction thereby recognizing that no enforcible agreement would exist unless confirmed in writing by the other party, the latter expressly refusing in writing to confirm without admitting that a contract was actually made, he cannot be charged on the alleged contract." Upton Mills v. Baldwin Mills (Minn.), 179 N. W., 904.

"A note or memorandum of the contract for the sale of personal property covered by the statute of frauds must include an adequate description of the property sold. It must set forth the subject-matter with such certainty that it can be identified without resorting to parol evidence of the intentions of the parties to supplement the terms of writing as to what the subject-matter is. Such a description as will render the property sold capable of identification is sufficient." 27 C. J., sec. 327; Wright v. Harrison, 137 Tenn., 157.

"A memorandum must state who are the parties to the contract, either by naming them or so designating and describing them that they may be recognized or identified without fair or reasonable doubt of dispute." 27 C. J., sec. 329.

"It must contain the names or sufficient description of both parties to the contract, not only the person to be charged, but also the person in whose favor he is to be charged." Sugar Co. v. Babcock Co., 67 Fed., 892.

"All the material features of the agreement must be included in the writing so that no resort to parol testimony is necessary,

further than to show the situation of the parties and the application of the terms employed in the writing to the subject-matter under consideration." Gulfport Cotton Co. v. Reneau, 94 Miss., 914.

"Substantially the entire contract must be expressed in writing." Soloman v. McRay, 9 Col., 23.

"The rule is that the writing, in order to be sufficient to satisfy the statute, must be coessential with the stipulation. It must cover the entire contract." Lester v. Heidt, 86 Ga., 226; 27 C. J., p. 268.

"Unless the names of both parties appear in the memorandum the contract may be foisted upon anyone by perjury, which is the very thing that the statute of frauds is enacted to prevent." Tobias v. Lynch, 192 App. Div., 54, 56, 182 N. Y. S., 643.

"The note or memorandum must contain the terms and conditions. Must show all the terms of the contract." 27 C. M., 334.

Counsel for appellee insists that Sappington of Roth & Company did tell Cohen that Ulhorn was the purchaser, and in support of that Roth & Company sent the telegram of confirmation to Mc-Gee, and whether Roth & Company had actual express authority or not makes no difference to Ulhorn, it is insisted, because Cohen authorized Roth & Company to make the offer, and when Ulhorn's acceptance of the offer was confirmed by Roth that ended it so far as Ulhorn was concerned. Counsel for appellee also insists that under the custom and usages between brokers and merchants dealing in sugar this was fully understood by the parties in the instant case; that these code words and other terms conveyed clearly the intention of the parties in interest, and in support of this contention the following authorities are cited:

In 17 C. J., pages 499, 500, 503, secs. 62, 63 and 66, the rule is stated to be:

"Sec. 62, Technical terms or words peculiar to some art, calling or occupation: "Words, technical or ambiguous on their face, or foreign . . . or peculiar . . .. to particular trades, professions, occupations or localities are explainable, where they are employed in written instruments by parol evidence of usage. While it has been intimated that the office of usage to explain the meaning of words should be confined to words which in common use have a recognized meaning but which have acquired a different significance in some trade or calling; and that terms having no. meaning except a technical one should be proved by expert testimony, no such distinction has ever been recognized in the decisions, and usage is always received to interpret the meaning of an unintelligible term, although it is purely technical in nature.

"Sec. 63. Adding unexpressed terms to written agreements: Evidence of usage is allowed not only to explain, but also to add tacitly implied incidents to the contract, in addition to those which

are actually expressed; and where a contract is not in itself a complete expression of the parties, valid and known usages, if not inconsistent with the express terms, are admissible to supply matters as to which the contract is silent. But where a contract is clear and complete, new terms cannot be added by usage. Thus usage is admissible to determine the proper mode of performance as, for example, to fix the method of weighing or measuring, or the place when or within which an act is to be performed. So it is admissible to show such matters as when the contract was intended to become effective, or how long it was intended to continue in force, or what amount of compensation is due thereunder.''

''Sec. 66. Quality, Terms and Price: In like manner and for like reason, evidence of usage on the question as to quantity, terms and price is admissible. Thus, where a contract called for 'sixty thousand cubic feet square white oak lumber,' a custom in the market to reject fractions of a foot in its measurement was held to be admissible. And where goods are 'to be taken by' a certain time, custom is admissible to show that these words meant as the purchaser might from time to time specifically order, and that if all were not ordered within the time specified, it was customary to send the purchaser a bill for the balance, and to hold such balance subject to his order, for a reasonable time. So usage has defined a cord of wood to mean one hundred and twenty-eight cubic feet. It has also defined the manner of weighing paper in the paper trade. So it is competent to show that ten ounces of silk thread signified between the dealers not a full pound but a trade pound. Again, it is competent to show by commercial usage that the words 'net balance' mean the balance of proceeds after deducting the expenses incident to the sale; that the word 'terms cash' in a bill of goods imply that a discount would be made if it was paid in six months; that, where goods are sold to a broker at a certain price 'cash,' a discount is allowed; that 'about' so many tons of hemp has a definite meaning when used in a delivery order; that a contract for the sale of gold 'short' means a sale of that which the seller does not have at the time, but which he expects to be able to purchase at a lower price; that the word 'honored' means paid, and not accepted, in the phrase in a merchant's letter, 'when the bills are duly honored;' that upon a note payable in cotton yarn, at 'wholesale factory prices' a certain discount is allowed by manufacturers and dealers; and that on a sale 'on note with approved security' negotiable notes are meant. And evidence of usage has been admitted to show the meaning of 'your wool,' in a written offer to buy 'your wool 16s per stone, delivered in Liverpool; of the words 'ex boats Spencer and Galt, in a contract for two boat loads western mixed corn, in Barber's stores, Clinton

whart ex boats Spencer and Galt;' of 'season' in a contract for grain 'the coming season;' of 'month;' of 'for shipment in June or July;' of 'to be paid for in from six to eight weeks;' of 'on freight;' of 'bale;' and of 'six per cent off for cash;' so to 'buyer's option,' 'on approval'' and 'immediate' delivery.' And abbreviations and ambiguous expressions as to the price in a written contract are properly explained by proof as to the customary meaning of such characters of contradictions.''

Under note 40 on page 503 (17 C. J.) there are numerous additional illustrations, including the following: "On a contract for the sale of prime barley, quality called for by such terms may be ascertained by mercantile usage. Whitmore v. Coates, 14 Mo., 9; Strickley's Choice Apples, Long v. J. K. Armsby Company, 43 Mo. App. 253.''

In an action in which a buyer claimed damages for breach of a contract to sell five carloads of lumber, evidence of common usage was permissible to show of what a carload of lumber consisted. Floyd v. Mann, 146 Mich., 356, 109 N. W., 679.

"The rule governing the effect of usage and custom in the law of sales is identical with the rule in all contractual agreements. There are two effects beside the gradual creation of new rules of law, which may be produced by usage of custom: (1) A meaning may be given to a word or phrase which it may not otherwise have; (2) an incident or term not expressed in the agreement may be added to it.'' Williston on Sales, Vol. 2, sec. 618.

In the case of Neilson & Kittle Canning Co. v. Lowe & Company, 149 Tenn., 561, it was held that a binding contract may be entered into by letter or telegram and in determining whether the facts present the elements of a contract, if a bona-fide intent on both sides to come to a definite agreement is shown, it should be construed, if possible, to constitute an agreement rather than to defeat one. It was further held in the Kittle case, supra, that "if a contract has been completed by means of correspondence, subsequent letters opening new negotiations cannot affect it, unless they result in a new contract, and that where the details of terms of payment are not provided for in a contract, cash terms will apply. It was further held in said case that, where seller unconditionally accepted buyer's order for a car of canned fish by letter and telegram, the request of seller following the telegraphic and mail correspondence for a signed contract would not constitute a practical construction on his part that no contract had, up to that time and until the signing of the contract by buyer, been completed; the original negotiations not having clearly contemplated and provided for the execution of such writing as a condition to be the completion of the contract.

In the case of Plesofsky v. Kaufman and Flonacker, 140 Tenn., 208.   Plesofsky, a retail clothier in Memphis, placed an order with the defendants for a lot of Palm Beach suits for delivery for the summer trade, delivery to be made about eight months later. There were no conditions to the order except that the defendant inserted a provision that it was not subject to cancellation.   Later, the defendants advised complainant that the only way they would ship the goods would be on a cash basis, allowing six per cent discount in lieu of the terms, and asking for a check for $100 to apply on account, upon receipt of which the goods would go forward with bill of lading attached. Plesofsky did not comply with their demand, the goods were not shipped, and a suit for damages was brought.   Plaintiff recovered judgment.   The defendants appealed to the Court of Civil Appeals, which affirmed the judgment, after which a petition for certiorari was filed and denied by the Supreme Court, the court holding that the defendant had no right to exact the additional condition.

We are of opinion that Roth & Company were agents of Cohen & Company and were acting within their authority when they made the offer to sell the 1200 bags of sugar through McGee, or to McGee.   McGee was acting for complainant Ulhorn when he negotiated and accepted the order.   Roth & Company confirmed and concluded the agreement to sell.   The terms were fully understood, and we are of opinion that the defendant did not have the right to demand a bank guarantee after Roth had completed the transaction, and of course when the letter was written March 5th, after the sugar had gotten to St. Louis the defendant again tried to change the terms of the contract by asking $8.65 per hundred for the sugar in St. Louis. We are of opinion that the statute of frauds does not defeat the contract made by Roth representing defendant and McGee, representing complainant; that the contract is evidenced by memorandum in writing, was fully understood by the agents representing the principals and these agents had the power and authority to bind the principals to the contract.

It results that we find no error in the judgment of the lower court.   All of the assignments of error are overruled and the judgment of the lower court is affirmed.   Judgment will be entered here against the defendant and his surety on appeal bond for the amount of the judgment rendered in the lower court, with interest from date of its rendition, and all the cost of the cause, for which execution will issue.

Heiskell and Senter, JJ., concur.